**STATE OF THE NETHERLANDS v. FEDERAL RESERVE BANK OF NEW YORK et al.**

United States District Court, S. D. New York.

May 14, 1951.

656

See also, D. C., 79 F.Supp. 966.

Sullivan & Cromwell, Allen W. Dulles, Joseph L. Broderick and H. Bartow Farr, Jr., New York City, for plaintiff.

Gustave A. Gerber, New York City, for interpleaded defendant, Verdun Joseph Archimedes.

Irving H. Saypol, U. S. Atty., William Koerner, Asst. U. S. Atty., New York City, for defendant, Federal Reserve Bank of New York.

Charles L. Kent, Irwin A. Seibel, Washington, D. C., amicus curiae for Attorney General and the Dept. of Justice of the United States.

GODDARD, District Judge.

This is a replevin action brought by the State of The Netherlands to recover four bearer bonds issued by United States corporations and now held by the defendant, the Federal Reserve Bank of New York. This action was commenced in the Supreme Court of the State of New York and later removed to this court by the defendant, with the consent of the plaintiff. The defendant, claiming no title to these securities, and merely a stakeholder herein, interpleaded one Verdun J. Archimedes, who

in turn answered and counterclaimed, asserting title to the bonds.

On May 10, 1940, the German Army invaded The Netherlands. On May 13, 1940, Queen Wilhelmina and her government moved to England. The Netherlands armed forces surrendered on May 14, 1940. The United States recognized this government-in-exile as the government of the Kingdom of The Netherlands.

The four bonds were owned on and prior to May 24, 1940 by four Netherlands domiciliaries. On that date the government of The Netherlands issued Royal Decree A–1. According to the allegations of the plaintiff, this decree vested protective title in the State of The Netherlands to all securities belonging to natural or legal persons domiciled in the Kingdom of The Netherlands for the purpose of conserving the rights of the former owners.

On May 18, 1940, Hitler promulgated occupation Decree No. 1 which placed the occupied Netherlands under the civil authority of a "Reichskommissar" who was immediately subordinate to Hitler and who was given full authority to legislate by personal ordinance.

On June 24, 1940, an enemy property ordinance [No. 26/40] was promulgated by the Reichskommissar. This ordinance provided for the appointment of "administrators" of enterprises which were "either mediately or immediately under predominant enemy control." A decree [No. 48/41] entitled "Ordinance for the Elimination of Jews from Economic Life" was promulgated by the Reichskommissar on March 12, 1941. All existing powers of owners, managers or representatives of Jewish enterprises were suspended by this decree.

Under these two ordinances, on May 3, 1941, a German citizen, one Alfred Flesche, was designated as "administrator" of the firm of Lippmann Rosenthal & Co., one of the leading banking partnerships of The Netherlands, with almost absolute powers of ownership under the supervision of the Reichskommissar.

On August 8, 1941, the Reichskommissar promulgated Ordinance No. 148/41 which compelled the Jewish residents of The Netherlands to deposit all negotiable assets, including cash and securities, with Lippmann Rosenthal & Co., Sarphatistraat [hereinafter referred to as LIRO], an office set up by the German authorities that used the name of the famous Netherlands banking firm. Since the four bearer bonds that are the subject of this action were owned by Jewish nationals of The Netherlands at the time of the German invasion, they were among the negotiable assets turned over to LIRO.

On November 21, 1942, the Reichskommissar ordered the merger of all individual accounts into one collective account as of January 1, 1943. Thereafter no records were kept of property due to any particular persons.

Two of the four bonds in question were transferred from LIRO to Vermogensverwaltungs und Renten Anstalt, a German foundation established as a collecting source for liquidated Jewish capital, and the other two were transferred to Der Lieter der Deutschen Dienstpast in den Besetzten Niederlandischen Gebeiten, the German Postal Service for the Occupied Netherlands.

In the latter part of 1943 the securities "deposited" by the Jewish Nationals, including the four bonds, were sold in the black market in Paris by an agent of the German government and the proceeds were credited to the account of Beauftragte bie der Niederlandischen Bank [German Representative with The Netherlands Bank].

The four bonds subsequently were acquired by a Swiss firm known as Arbitrium. In October, 1946, while in Switzerland, the interpleaded defendant, Archimedes, purchased from Arbitrium at a discount some securities issued by United States corporations. They were sent to him at his residence in San Francisco. He disposed of them through San Francisco brokerage firms.

The following January, Arbitrium cabled him that it had some similar securities for sale. He left the United States, went to Switzerland, and again made a purchase, one larger than the first, including the

four bonds now in question. At his request, they too were mailed to him in the United States.

In February, 1947, he acquired a third [and still larger] group of securities from Arbitrium.

In March of that year, as he was preparing to leave for Switzerland to make a fourth purchase, our government learned of his activities. He was apprehended and indicted for violation of United States foreign funds control regulations in that he did not declare the importation of foreign purchased securities and in that he did not file and deposit them with the Federal Reserve Bank in accordance with General Ruling No. 5, 5 F.R. 2159, as amended, 8 C.F.R. 511.205. He then deposited the securities still in his control, including the four bonds here involved, with the Federal Reserve Bank as required by the above law. This action followed.

The plaintiff contends (1) that United States freezing control legislation and regulations absolutely prevented the interpleaded defendant from acquiring title to the four bonds; (2) that, even if this legislation does not apply, the interpleaded defendant is not a holder in due course and consequently has no title to the above securities which the plaintiff alleges were illegally taken by LIRO; (3) that, since the plaintiff has legal title by virtue of the Royal Decree A–1 of May 24, 1940, enacted by the Royal Netherlands Government-in-exile in London and promulgated by Queen Wilhelmina, the plaintiff should be awarded immediate possession of the securities.

The interpleaded defendant asserts that neither the Royal Netherlands Decree A–1 nor the United States freezing control legislation applies to this case and that he is a holder in due course of negotiable instruments and consequently he is the present holder of the legal title and is entitled to immediate possession of the securities.

The Royal Netherlands Decree A–1 promulgated on May 24, 1940, provides in part as follows:

"1] Title to claims against persons, partnerships, companies, corporations, firms, institutions and public bodies, which claims belong to natural or legal persons domiciled in the Kingdom of the Netherlands, * * * in so far as these claims are in any form whatsoever capable of being encumbered, pledged, transferred or sold or the like, outside of the Realm in Europe, is hereby vested in the State of the Netherlands, as represented by the Royal Netherlands Government, temporarily resident in London and exercising its functions there * * *".

\* \* \* \* \* \*

"3] The proprietary rights vested in the State of the Netherlands, by virtue of the provisions of the preceding paragraphs, shall only be exercised for the conservation of the rights of the former owners."

The testimony is that the decree purported to vest in the State of The Netherlands protective title to all claims belonging to Netherlands domiciliaries that were capable of being transferred outside the nation's realm in Europe.

In 1942, the New York Court of Appeals had occasion to consider Royal Decree A–1 when property, located in New York and owned by Netherlands residents, was attached for the benefit of a non-resident alien. Anderson v. N. V. Transandine, etc., 1942, 289 N.Y. 9, 43 N.E.2d 502. The decree was given effect by the New York Court, with the result that the attachment was vacated at the instance of The Netherlands government. The court reasoned that the decree was not confiscatory; rather, it was meant to conserve the assets of Netherlands nationals and was in keeping with New York public policy because designed, in part, to prevent such property from falling into the hands of what was then a common enemy of The Netherlands and the United States for use in prosecuting the war. Similarly, during the war, an English Court gave recognition to a decree of the Norwegian government in exile which vested in the absent Norwegian Sovereign title to ships located outside Norway, and belonging to nationals inside the occupied country. Lorentzen v. Lydden & Co., Ltd., (1942) 2 K.B. 202.

Changed circumstances, and different facts, require that the application of the Anderson case to the present situation be

closely scrutinized. But see State of The Netherlands v. Federal Reserve Bank of New York, D.C.S.D.N.Y., 1948, 79 F.Supp. 966. The bonds, in the case at bar, were located within Netherlands territory that was under military occupation by Germany at the time Decree A–1 was enacted. In the Anderson case, the disputed property was at all material times situated within the United States.

Royal Decree A–1, when promulgated by The Netherlands Government-in-exile, in reality was dependent for its enforcement upon the cooperation of other sovereigns. In Anglo-American law there is a reluctance to give extra-territorial effect to foreign legislation. However, by the time the issue of the enforcement of the decree was determined by the highest New York court, the United States had become an ally of The Netherlands and, for the reasons previously stated, the decree of that country quite naturally was acceptable to the court.

■ Furthermore, from the standpoint of international law theory, The Netherlands Government-in-exile had the status to legislate in connection with assets of its nationals situated in foreign countries whether or not such countries chose to apply the law within their respective jurisdiction. Military occupation by a belligerent enemy does not transfer sovereignty over the occupied territory to that enemy, but confers only quite limited authority to regulate the area. Oppenheimer, Governments and Authorities in Exile, 36 Am.J. of International Law 568, 571 (1942); VI Hackworth, Digest of International Law, P. 385, 391 et seq. (1943); Article 43, annex to the Fourth Hague Convention, 1907, 36 Stat. 2277, 2306.

■ The absent sovereign remains the de jure government of the country. Recognition as such by the United States and other nations served only to confirm this principle. [Oppenheimer, supra, p. 571; 6 Modern Law Review 208 (1943)], but did not necessarily commit them to the acceptance of acts that would not be in accord with the authority of an absent sovereign. Thus, the mere fact that our government recognized The Netherlands Government-in-exile would not confer upon The Netherlands Government-in-exile jurisdiction which did not exist.

In legislating upon the subject of assets of Netherlands domiciliaries located outside the occupied territory, the government-in-exile was performing functions consistent with its then status. As the sovereign, it could endeavor to preserve the interest of its nationals in properties situated beyond enemy control, especially when those residing within the occupied territory might find themselves powerless to protect those interests. In addition, as a belligerent antagonist it endeavored to keep properties which were beyond the territorial reach of the occupying power from, in some way, being applied for the enemy's benefit.

■ However, it does not follow that the same criteria apply when the legislation concerns assets within the confines of the occupied territory. Though remaining the sovereign, the absent government may, nevertheless, be limited in its further authority to govern the subjugated areas. Cf. 3 Hyde, International Law Chiefly as Interpreted and Applied by the United States, P. 1886 [2nd Rev.Ed.,1945].

There is only meagre authority and commentary upon the power of the absent sovereign. In general, the view most prevalent prior to World War II, and influenced by decisions and practices stemming from World War I occurrences, considered the acts of the de jure governments as having, of themselves, no force and effect in occupied territory. Occupation of Cavalla Case, 1929–30 Ann.Digest No. 292, p. 496 [Greece, Court of Thrace, 1930]. The available evidence indicates that this doctrine was a part of Anglo-American and German jurisprudence. Stein, Law of Belligerent Occupation, 46 Mich.Law Rev. 341, 351–58 (1948).

The Belgian authorities have diverged somewhat from this theory asserting that the absent sovereign retained his legislative powers over the occupied territory. But the doctrine was largely an outgrowth of decisions of Belgian tribunals passing upon the effect of decrees of the absent Belgian sovereign after Belgian territory was restored at the conclusion of World

War I. Stein, supra, p. 358–69; Feilchenfeld, the International Economic Law of Belligerent Occupation, p. 136–39 (1942). But see, VI Hackworth's Digest, p. 398. Even the Belgian theory recognized that hostile measures, aimed at combatting the occupant and hampering his rule, were not applicable in those regions occupied by the enemy. DeNimal v. DeNimal, Ann.Dig. 1919–1922, No. 311, p. 447; Stein, supra. p. 360. Apparently, The Netherlands jurisprudence accepted at least this much, and may even have embraced the Anglo-American view. Feilschenfeld, supra, p. 141.

The decree in question was not a neutral edict. If effective as designed, it would have seriously impaired the negotiability of the bonds in question as well as all other transferable claims. It would have disturbed the commercial life of the occupied community, and cast uncertainty upon numerous normal business and security transactions. Its aim was avowedly partisan—to hinder the use of the assets of Netherlands domiciliaries by the enemy, and it did not specify or distinguish between assets secured by the enemy through legitimate or illegitimate means. Being an instrument of economic warfare, it would not be, and was not, implemented by the occupying authority so as to affect assets within its territorial control.

An examination of the development of the American attitude towards belligerent occupations discloses that it was at least originally considered that conquest suspended the sovereignty of the former possessor in favor of the enemy occupant. United States v. Rice, 1819, 4 Wheat. 246, 254, 4 L.Ed. 562; cf. Thirty Hogsheads of Sugar v. Boyle, 1815, 9 Cranch 191, 3 L.Ed. 701. The Rice case has special weight inasmuch as it was United States territory that had been seized, and the Supreme Court held that this country's tariff laws did not apply therein. In Coleman v. State of Tennessee, 1879, 97 U.S. 509, 517, 24 L.Ed. 1118 the court recognized that under military occupation "the political relations between the people of the hostile country and their former government or sovereign are for the time severed." However, "the municipal laws * * * remain in force, so far as they affect the inhabitants of the country among themselves, unless suspended or superseded by the conqueror."

Since ratification of the Hague Regulations respecting land warfare, it is no longer understood that military occupation effects a transfer of sovereignty. 36 Stat. 2277, et seq.; See, especially Article 43, annex to Fourth Hague Convention, 36 Stat. 2306; VI Hackworth's Digest 385, 386.

Nevertheless, the United States broadly construes its powers to legislate for enemy areas it has occupied. VI Hackworth's Digest 391. So far as I have been able to discover, throughout World War II the United States has adhered to its position that, as a matter of law, the decrees of an absent sovereign, even a friendly one, were a nullity in the areas occupied by the United States except to the extent that the United States chose to · implement them. Stein, supra, p. 351, n. 22, 352, 365–370.

■ Irrespective of the particular theory adopted, it must be acknowledged that under concepts prevailing at the time Royal Decree A–1 was promulgated, the enactment would not be considered applicable in the occupied areas as a matter of international law or pursuant to relevant conflict of laws principles. Feilschenfeld, supra, p. 142–3. Thus, it was not effective to transfer title to assets in territory under enemy military occupation at the time the decree purported to do so.

Only one reason would justify a departure from these principles; that is, if modern concepts which condemn the waging of aggressive war, as expressed in and after World War II, necessitate an abandonment of prior theories with respect to the authority of sovereigns absent from their homeland by virtue of military occupation. Thus, if guided by partisan intent, the occupation itself need not be recognized by those in sympathy with the exiled government, and all manner of rules and theories may be disregarded to the end that aid is extended to the conquered and the conqueror opposed.

It may be that had this case arisen for decision while the United States was at war, some might have felt less compulsion to

examine so closely the effect of the action of The Netherlands government. But, today, farther removed from the influence of these former political events and emotions, it is only just that principle be not subordinated to expediency insofar as conflict with current international commitments is not occasioned thereby. Cf. Bank of China v. Wells Fargo Bank & U. T. Co., D.C.N.D. Cal., 1950, 92 F.Supp. 920.

Moreover, in the light of the prime place that comity and reciprocity have in international law, other nations are apt to treat us no differently, and certainly no more favorably, than we treat them. In determining the problem now presented, it is quite relevant to bear in mind that the policy of the United States, as previously stated, is not to treat absent sovereigns as having authority to legislate for areas under our occupation. If other nations are to respect this principle when considering situations in which we claim it applies, there is some responsibility upon us to uphold and apply it when evaluating similar circumstances involving others.

It can be argued that not to give complete effect to Royal Decree A–1 results in a failure to discourage adequately the abhorrent "looting" of private property practiced by the Nazis in the occupied countries. Actually, the issuance of the order neither halted the Germans from taking the action they did, nor from realizing, at least in part, on the assets seized. The illegality of the confiscation of private property had previously been declared in the Hague Regulations [Article 46, annex to the Fourth Hague Convention, 1907, 36 Stat. 2277, 2306, 2307]. Those knowingly dealing in such property took the risk of the defective titles they obtained. So long as it be granted that the rightful owners are entitled to the restoration of the bonds, and we recognize the existence of legitimate methods for accomplishing this, it is unnecessary to sanction a means having only dubious justification in law.

In addition to what has been previously referred to, the essential operation and impact of The Netherlands decree presents further grounds for pause. Even in the Anderson case, where effect was given to the decree, the claimant of the funds was a non-resident alien. There is evidence which suggests that, had the rights been asserted by resident creditors or distributees, the presence of conflicting principles might have lessened the chances of this result. See In re Kahn's Estates, Sur.Ct., 1942, 179 Misc. 939, 38 N.Y.S.2d 839, 842.

To permit The Netherlands government, by virtue of this decree, to marshal, for eventual return to the proper claimants, assets once held by its domiciliaries may, in fact, serve to hinder or delay satisfaction to many having lawful interests in the property. I do not mean to imply in the least that the efforts of the State of The Netherlands are actuated by any but a most worthy purpose. Nevertheless, the title it asserts is not that of, or derivatively through, the real and present owners to whom the property would be restored, but rather that of or through the holders at the time the decree purported to take title. Yet, those persons who once possessed the properties may not, either because of death or otherwise, be the ones entitled at this time. Thus, because such circumstances are not relevant in establishing The Netherlands' title under the decree, if the plaintiff were to prevail, it would tend to preclude our courts from an inquiry into the identities, whereabouts, and rights of present interested persons except the rights of those holders forced to yield up the assets. If this be so, it may lead to the relinquishment of properties, now in this country, without knowledge, or an opportunity to contest, on the part of ultimate American claimants, including heirs of deceased former owners, and domestic creditors of foreign claimants, if such there be.

I have little doubt that the restoration of confiscated properties can be accomplished, and with the active assistance of the State of The Netherlands, in a manner that will afford our and other courts an opportunity fully to hear and determine all claims to these and other securities which, after proper notice, may be presented for adjudication. Though the perceptible defects in the present method perhaps would not, of themselves, justify its rejection, they hardly encourage an authorization of the

program where its adoption means accepting a rule contrary to recognized international law theories of belligerent occupations, and contrary to the conceptions and practices of United States executive authority in the matter of its own military occupations. I am of the opinion, for the reasons discussed above, that Royal Decree A-1 did not effect a transfer of title to the bonds in question upon which the State of The Netherlands may base its claim to the bonds in question.

In reaching this decision, there is one point that deserves brief mention. The rule has been consistently followed that our courts do not question the validity of the acts of foreign governments that affect property within the territorial jurisdictions of those governments. Ricaud v. American Metal Co., 1918, 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 38 S.Ct. 309, 62 L. Ed. 726; Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 1947, 163 F.2d 246, certiorari denied 1947, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357.

This principle, as I understand it, must apply only insofar as it is conceded that the foreign government acted within its territorial jurisdiction. However, the foregoing discussion demonstrates that the absent sovereign lacked the authority to legislate, effectively, for the occupied areas in the manner it attempted. For this reason, the above mentioned rule is not deemed apposite to the case at bar.

It is also of note that at the time Royal Decree A-1 may be said to have become effective in the occupied territory; that is, when the once-ousted government returned subsequent to the termination of the occupation, the bonds in question were then situated outside The Netherlands in the hands of unknown holders. Thus, again, the decree did not affect property within the government's territorial jurisdiction. Moreover, The Netherlands is not asserting title derived or taken from claimants of these bonds as of this later date when the occupied lands were restored and legisla-

tive jurisdiction for the area recommenced, but instead, title derived from those who were owners at the time the decree was promulgated just after the enemy's occupation had begun.

Having disposed of plaintiff's claim to the bonds in question, there remains for determination the extent of the rights, if any, which interpleaded defendant, Archimedes, has to them.

The plaintiff urges that the United States freezing control legislation and regulations absolutely prevented Archimedes from acquiring any interest in the four bonds.

The chief purposes of the Trading with the Enemy Act, as amended during World War II[1], and the executive orders and regulations promulgated thereunder, was to prevent, so far as possible, the Nazi occupiers of many of the financial centers of Europe from profiting by the seizure of American securities located abroad from which dollar exchange could be obtained for the Axis powers, and to protect the nationals of countries overrun by the enemy from being dispossessed of title to their property. This legislation and the regulations issued thereunder, generally referred to as "freezing controls", expressly prohibit transactions in securities covered by the freezing legislation unless authorized by the Secretary of the Treasury.

Section 5(b) of the Trading with the Enemy Act, as amended, 55 Stat. 838, 839, 50 U.S.C.A. Appendix, § 5(b), provides in part as follows:

"(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, * * *

"(A) * * * * *

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, * * * transfer, * * * or dealing in, or exercising any right, power, or privilege with respect to,

---

1. 40 Stat. 411 (1917) as amended by the Joint Resolution of May 7, 1940, 54 Stat. 179, and by Section 301 of the First

War Powers Act of 1941, 55 Stat. 839, 50 U.S.C.A.Appendix § 1 et seq.

or transactions involving, any property in which any foreign country or national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States * *".

Pursuant to the authority granted to him by Section 5(b) of the Trading with the Enemy Act of October 6, 1917, 40 Stat. 411, President Roosevelt signed Executive Order No. 8389, 5 F.R. 1400, on April 10, 1940. This order, as amended by Executive Order No. 8785, 6 F.R. 2897, was specifically ratified by Section 302 of the First War Powers Act of 1941, 55 Stat. 838, 840.

This order, as amended, 12 U.S.C.A. § 95a, note, provided in part as follows:

"Section 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise; if (i) * * * (ii) such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect;

\*  \*  \*  \*  \*  \*

"E. All transfers, withdrawals or exportations of, or dealings in, any evidences of indebtedness or evidences of ownership of property by any person within the United States; and

"F. Any transaction for the purpose of which has the effect of evading or avoiding the foregoing prohibitions.

"Section 2.

"A. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise;

\*  \*  \*  \*  \*  \*

"(2) The acquisition by, or transfer to, any person within the United States of any interest in any security or evidence thereof if the attendant circumstances disclose or indicate that the security or evidence thereof is not physically situated within the United States."

On May 10, 1940, this order was amended by Executive Order No. 8405, 5 Fed. Reg. 1677, to prohibit transactions involving the property of The Netherlands or nationals thereof. Executive Order No. 8785 extended the prohibitions to cover all continental Europe.

It is convenient to defer consideration of Section 1 of the Order until Section 2 has been considered. There is no doubt that, within the meaning of the latter section, the bonds in question were known to be physically situated outside the United States at the time of their purchase. However, the section also requires that they be acquired by, or transferred to, a person "within the United States."

Archimedes left the United States for Switzerland to select bonds from a list in the office of Arbitrium and he paid for them there. In this transaction, however, the bonds apparently were not delivered to him, and it has not been shown that he even saw them, but they were, within a few days, mailed to his address in the United States. At the time the bonds were posted by Arbitrium, Archimedes had not yet returned to the United States. But upon his return he obtained them.

It must be concluded that the nature of this transaction was such that the securities were, in all respects, acquired by Archimedes while he was on foreign soil so that it cannot be said that any additional interest was transferred to him during his presence in the United States. In respect to the place where the transaction took place, there has been no proof of Swiss law on the question of the point at which the negotiation of the bonds to Archimedes was completed.

■ Applying the law of the forum, these bearer bonds were negotiated by delivery, N.Y. Negotiable Instruments Law § 60, McK. Consol. Laws c. 38, and the delivery of them was effectual at the time they were mailed. Bacal v. National City Bank of New York, Mun.Ct., 1933, 146 Misc. 732, 262 N.Y.S. 839; Finn v. National City Bank of City of New York, City Ct., 1942, 36 N.Y.S.2d 545. Conse-

quently, no further rights in the bonds were acquired by Archimedes upon his actual receipt of the bonds in the United States. For this reason, Section 2 is inapplicable to the transaction at bar. It may be added that essentially, Section 2 was designed to proscribe assignments in the United States of assets located abroad.

Passing now to Section 1, it is clear that the purchase of the bonds in question by Archimedes was a dealing in evidences of indebtedness in which a national of a foreign country designated in the Executive Order had, on the effective date of the Order, an interest in the property. There can be no doubt that Section 1 would prohibit the transaction by which the interpleaded defendant acquired the bonds had this transaction taken place in the United States.

The interpleaded defendant contends that since he went to Switzerland to consummate the deal, his purchase was not "by any person within the United States" and that Section 1 therefore is not applicable. However, this argument fails to take into account Section 1(F) which prohibits, without authorization from the Secretary of the Treasury, "any transaction for the purpose or which has the effect of evading or avoiding the foregoing prohibitions" some of which are contained in Section 1(E). Section 2 had no provision of like import pertaining to the matters prohibited by its terms.

After receiving notice in the United States by cable that the securities now in question were available for purchase, the interpleaded defendant ignored the seller's suggestion that he complete the transaction by mail and flew to Switzerland with the express purpose of purchasing them. There he paid for the bonds and made arrangements to have them mailed to him in the United States. Even if this trip were not made for the express purpose of evading or avoiding the prohibitions in this order, it at the very least had the effect of doing so. The effectiveness of the freezing controls would be seriously impaired if they could be avoided by merely going across the border to consummate the transaction. It is believed that Section I(F) closed this loophole.

Since the interpleaded defendant is now, and was at all times here involved, a citizen of the United States, power existed to regulate his actions outside the territorial limits of the United States whether or not the condemned act occurred within the territory of a foreign nation. Vermilya-Brown Co. v. Connell, et al., 1948, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76; Blackmer v. United States, 1932, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375; United States v. Bowman, 1922, 260 U.S. 94, 43 S. Ct. 39, 67 L.Ed. 149.

I think that Section I(F) of Executive Order No. 8389, as amended, was jurisdictionally capable of applying, and was intended to apply, to the transaction now at bar. Accordingly, Archimedes' purchase of the bonds he now claims was prohibited unless authorized by the Secretary of the Treasury, and the proof is that no such authorization was obtained.

The effect of the freezing controls upon a "prohibited" transaction is far from clear.

If guided only by Propper v. Clark, 1949, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480, and Bernstein v. N. V. Nederlandsche-Amerikaansche, etc., 2 Cir., 1949, 173 F.2d 71, there would be little doubt that the correct procedure is to treat unsanctioned transfers as a nullity, and ascribe to the transferee no interest in the property unless and until a validation of the transaction by the Treasury Department is secured. But more recently, in Lyon v. Singer, 1950, 339 U.S. 841, 70 S.Ct. 903, 94 L.Ed. 1323, the Supreme Court affirmed decisions of the New York Court of Appeals which weighed and adjudicated the interests in frozen funds of creditors whose claims were, at the time, barred from payment by the foreign property controls. Thus, the actual satisfaction of the judgments was to await the granting of appropriate licenses by the federal government.

The Supreme Court distinguished its prior ruling in Propper v. Clark on the ground that in the earlier case the claimant

was asserting adversely to the Alien Property Custodian, then the plaintiff in the suit, and was seeking to deny his vesting power. However, what was said in Propper v. Clark concerning the general effect of the foreign funds regulations did not indicate that so limited a decision was, at that time, intended.

The matter becomes additionally complicated by virtue of the Bernstein decision by our Circuit Court which, prior to the Supreme Court's determination in Propper v. Clark, had also declined to adhere to the New York doctrine. The Circuit Court stated that an unlicensed transfer of title to frozen funds should not be recognized, and significantly, did so where the Alien Property Custodian was not an adverse claimant in the suit. In view of Lyon v. Singer, however, and without further expression by the Supreme Court, it is difficult to appraise the weight of the Bernstein decision as a final precedent.

In examining these cases, an explanation of their different results can be found which is also in keeping with the purpose of the regulations in question. In both the Bernstein and Propper cases, the courts had under consideration the extent of interests derived from transactions which were, in themselves, proscribed. In each, the purported transfer, which would give rise to the claim, was illegal. On the other hand, in Lyon v. Singer the rights which were validated arose out of transactions not illegal in their inception. In one case a credit was transferred before the freezing order was applicable; in another, a draft was purchased in a foreign country although drawn on and payable by a bank located in New York. In these instances, it was only the payment of the credits which the federal regulations interdicted and not the underlying transactions that gave rise to the claims. Under such circumstances, the Supreme Court permitted the recognition of the validity of the claims.

From the reasoning in these cases, it would seem to follow that inasmuch as the actual transaction through which Archimedes asserts his interest was, by law, prohibited, he cannot avail himself of the Lyon v. Singer rule. Accordingly, I do not think that he has any valid claim to the bonds. But, in this conclusion, realizing that it emanates from a distinction which the Supreme Court did not itself express, there may be some doubt about it. For this reason, it is desirable that the applicability of the freezing orders be, at this point, disregarded so that the nature of Archimedes' interest in the bonds may be evaluated as if the monetary regulations do not dispose of the issue.

It has been found previously that title to these securities reposed in four nationals of The Netherlands when the Germans occupied The Netherlands. Under the law of any of three jurisdictions that might possibly be said to govern this phase of the case [i.e., New York, The Netherlands, or Switzerland], LIRO did not acquire title when it obtained the bonds. Indeed, even if one of the foreign jurisdictions would recognize valid title in LIRO, such recognition would not be in accord with the public policy of New York State and the United States, and could hardly be acceptable to this court.

Plainly, under the rules governing land warfare of the Hague Convention, the confiscation of private property by a belligerent occupant is expressly prohibited. Articles 46, 53, annex to the Fourth Hague Convention, 1907, 36 Stat. 2277, 2306–7, 2308. Moreover, the New York Negotiable Instruments Law contains a provision, as follows:

"§ 94. When title defective

"The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to fraud."

It is conceivable that under the doctrine of Bernstein v. Van Heyghen Freres Societe Anonyme, supra, this court should accept without question the validity of these official acts of the Nazis. However, the Van Heyghen case, which has not been spared unfavorable comment [see,

e.g., *57 Yale Law Journal* 108; *47 Columbia Law Rev.* 1061], considered only the public acts of officials committed within the territorial boundaries of the state they served. The "acts of state" doctrine has never been applied to official conduct of an enemy nation in territory beyond its boundaries under its temporary wartime military occupation. Furthermore, our executive department has expressly reserved the right of the United States to declare invalid the forced transfers of property decreed by Nazi officers for the occupied countries. Declaration of January 5, 1943. [Department of State Bulletin, Vol. VIII, No. 185, p. 21].

The fact that these edicts are so contrary to our public policy weighs heavily against extending the Van Heyghen doctheir application outside the boundaries of Inasmuch as these German ukases had their application outside the boundaries of Germany in areas controlled under a military occupation subsequently terminated by Allied victory over Germany, this court is not inhibited from inquiring into their validity and determining their consequences upon the property at which they aimed. Consequently I am persuaded that title to the bonds remained in the parties from whom the securities were looted—defeasible, however, by a subsequent acquisition by a holder in due course.

Again, under neither the law of New York, nor The Netherlands, nor of Switzerland, has the interpleaded defendant demonstrated that he, or a person through whom he claims, was a holder in due course. Since the result would be the same under the laws of any of these jurisdictions, it is unnecessary to decide which is particularly decisive of this issue.

I shall consider first the law of New York State. The interpleaded defendant contends that he is a holder in due course and as such, under Section 96 of the New York Negotiable Instruments Law, "holds the instrument free from any defect of title of prior parties".

However, Section 98 of this law provides in part: "Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. * * * "

Since it has not been shown that any person under whom he claims acquired the title as a holder in due course, it is incumbent upon the interpleaded defendant to prove that he himself is such a holder. Section 91 of the New York Negotiable Instruments Law defines a holder in due course as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That it is complete and regular upon its face;

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

"Good faith" is used in this section in the legal or commercial sense. Rochester & C. Turnpike Road Co. v. Paviour, 164 N.Y. 281, 58 N.E. 114, 115, 52 L.R.A. 790. In determining the existence or non-existence of good faith, one must look at all the circumstances of the case. In Rochester & C. Turnpike Road Co. v. Paviour, supra, the court set up the following test: "Even if his [holder's] actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith, and the law will withhold from him the protection that it would otherwise extend. * * * One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose."

The circumstances in the case at bar, as disclosed in the testimony of the interpleaded defendant himself, when viewed in

the light of the general principles of New York law set forth above, show clearly that the interpleaded defendant did not take the bonds in good faith and is therefore not a holder in due course.

With a bankroll of from $25,000 to $28,-000, allegedly gained by running a dice game at an officers' club while in the army, Archimedes went to Italy in 1946. In some three months there, he made a profit of from $8,000 to $10,000 in foreign currency transactions. He then went to Zurich, Switzerland, in an effort to purchase thousand dollar bills, or anything else, at a discount in order to "make as much money as I could". Not being able to acquire what he wanted in Zurich, he went to Zug, a quiet Swiss hamlet and visited a firm known as Arbitrium. There he was told that he could make a larger profit by buying securities at a discount and he was offered at a large discount securities issued by American corporations. He was allegedly guaranteed that he could realize a profit of 14 percent by merely selling these securities in the United States. He had little or no knowledge of the individual securities in the parcel offered him. He says he was told they had been acquired in the neighboring countries. Many of them had back interest coupons from 1940 and 1941. He "fingered" the bonds, gave them a cursory glance, selected from the list the ones he desired, gave Arbitrium $21,000, and asked that the securities be airmailed to him in the United States.

▇ It was common knowledge that many securities had been looted by the Germans in countries which they had overrun.

Arbitrium had been placed upon the "Proclaimed List" published by the United States Government some time between the inception of the list on July 17, 1941 and its first revision on February 7, 1942 and remained on this "list" until it was discontinued in the summer of 1946. Archimedes' inquiries regarding the firm of Arbitrium were confined to the local Travel Bureau in Zug, and to a proprietor, waitress, and a "couple of customers" in a restaurant in Zug. It was obvious that none of these inquiries was searching. Despite this, he left $21,000 with Arbitrium, a firm which he acknowledges was unknown to him before this transaction. Upon receiving the money, Arbitrium agreed to mail this parcel of securities to him in the United States.

Even though all the coupons from 1940 to 1941 onward were still on the bonds—an unusual and an especially suspicious thing in view of the circumstances under which Archimedes acquired the bonds—he said that "the thought never entered my head to ask Arbitrium about the securities". Another unusual circumstance is that he said that after receiving the various securities he destroyed the invoices. That he was not free from guile, and that he thought it wise to conceal the facts and the history of the bonds, is clearly indicated in his explanation to a broker as to why there were so many coupons on the bonds. Archimedes told him that he had "just cleaned out a couple of safes". There are reasonable grounds for believing that either he had more knowledge of the origin of such securities then he cared to admit, or blinded himself from being adequately advised.

Upon his return to the United States, he sold the securities, or part of them, in San Francisco.

In January, 1947, Arbitrium cabled the interpleaded defendant that they had some more bonds and recommended that he mail them the money for them. However, he travelled to Switzerland again and bought as many securities as he could with the money he then had. This second transaction was consummated in the same way as the first. The bonds here in issue were included in this second parcel which he sold in New York City.

Subsequently he was indicted for violation of United States foreign funds control legislation in that he "then and there well knew" that he had imported certain securities and had failed to deliver them to a Federal Reserve Bank within five days after their receipt in the United States. [General Ruling 5, supra]. On August 15, 1947, he pleaded guilty to four counts of this six count indictment.

It seems clear that the circumstances under which the interpleaded defendant purchased the bonds in question were such as should have induced him to make a much more extensive investigation of the seller and the securities than he did make. Under the circumstances surrounding this purchase, the admitted guaranteed profit of 14 percent [there is evidence to indicate that the profit was even higher] and the presence of the back coupons alone should have been enough to have aroused his suspicions. His failure to investigate further can be explained only as a willful evasion of his duty under the circumstances of inquiring into those matters which he knew, or had reasonable cause to suspect, would show a defective title in the seller of the securities. It is clear that he did not act in good faith and did not acquire title in this transaction with Arbitrium under the New York law.

Under the law of The Netherlands, the result would be the same. It was established by testimony and other evidence at the trial that The Netherlands statutes applicable to this case are Sections 20–35 and 37–38 of Decree E–100 and Section 36 of Decree F–272. In essence the law is as follows—property, including securities, that passed from the original owner to any actual possessor under war or occupation circumstances under threat, duress, and undue influence must pass back to the original owner unless the actual possessor purchased said property in good faith and for value. Good faith must be established by the one who asserts it. The Dutch courts have consistently held that parting with securities through delivering them to LIRO was parting with them within the meaning of Decree E–100; that is, parting with them under duress, threat or undue influence. Thus the interpleaded defendant has the burden of proving his good faith. Article 32 of Decree E–100 provides—"Good faith can be accepted only if the person to whose good faith appeal is made, neither knew or ought to have reasonably supposed that the possession of the thing or the right had got lost to the owner thereof in consequence of a jural transaction."

The Dutch courts have required that the purchaser conduct a personal investigation and to assure himself that there is no possibility of his purchasing looted securities. Of approximately one hundred published cases, in only two or three have the Dutch courts found the required good faith. If a purchaser does not require the seller to show him a "slip of purchase" [a notice of purchase given the transferee of securities in The Netherlands] showing that the seller had the securities before the occupation, he acquires the securities at his own risk.

Hence, the interpleaded defendant was not a good faith purchaser under the legal standards of The Netherlands.

Swiss law would require a similar result. Article 935 of the Swiss Civil Code provides that bearer securities, taken away from the possessor against his consent, may be recovered from one other than a bona fide transferee. Article III of the Swiss Civil Code provides that a person cannot claim good faith if such good faith is incompatible with the care required of him under the circumstances. Once the dispossessed person seeking recovery has shown that the purchase was made under suspicious circumstances, the purchaser has the burden of establishing his good faith.

Commentaries on the Swiss law by Swiss legal experts introduced in evidence at the trial of this cause stated that the standard of care required of a purchaser of negotiable instruments in order to qualify that purchaser as a bona fide purchaser is measured as the fair amount of care which an honest person would have applied under similar conditions. Unusual circumstances [and the circumstances of the purchase here were at least unusual] would increase the standard of care required.

■ The dubious quality of the entire transaction by which the bonds in question were acquired—the presence of glaring, unwholesome indications, together with the failure of interpleaded defendant even to be mildly suspicious and inquire further—are sufficient to convince that he did not exercise the degree of care that the average honest person would have exhibited in

670

like circumstances. Therefore, he is, under Swiss law, not a bona fide transferee and the bonds may be recovered from him by the rightful owner.

My conclusion must be that neither plaintiff nor interpleaded defendant has established a valid claim to the bonds whose possession they seek. Accordingly, the securities remain in the custody of defendant stakeholder to await the appearance of proper claimants, or other appropriate disposition.

This opinion shall serve as the findings of fact and conclusions of law.