## STATE OF THE NETHERLANDS v. FEDERAL RESERVE BANK OF NEW YORK et al.

**No. 8, Docket 22328.**

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1952.

Decided Jan. 21, 1953.

See also 79 F.Supp. 966.

Joseph L. Broderick, New York City (Sullivan & Cromwell, Arthur H. Dean and Karl G. Harr, Jr., New York City, on the brief), for plaintiff-appellant.

Gustave A. Gerber, New York City, for interpleaded defendant-appellee.

Rowland F. Kirks, Asst. Atty. Gen., Director, Office of Alien Property, and James D. Hill, George B. Searls and Irwin A. Seibel, Attys., Department of Justice, Washington, D. C., for the United States as amicus curiae.

Before AUGUSTUS N. HAND, CHASE and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This action for the possession of four bearer bonds of American corporations[1]

---

[1] The bonds were each in the amount of $1,000 issued by the Southern Railway Co., the Missouri-Kansas-Texas R. R. Co., the Union Pacific Railroad Co., and the Union Pacific Railroad Co., respectively.

was instituted in the New York Supreme Court by the State of the Netherlands against the Federal Reserve Bank of New York, which now holds the bonds in a blocked account. The defendant removed the action to the federal court below in accordance with the provisions of 12 U.S.C.A. § 632. At the same time it procured an order of interpleader against one Verdun J. Archimedes, who had been required to deposit the bonds with defendant and asserts title to them. And defendant asked to be relieved from further liability except as stakeholder.

The facts upon which both plaintiff and interpleaded defendant predicate their claims were found by the district court substantially as follows: On May 10, 1940, the German army invaded the Netherlands, whose armed forces surrendered on May 14. In the meantime, on May 13, Queen Wilhelmina and her government moved to England, where a government-in-exile was established. The United States recognized this as the government of the Kingdom of the Netherlands.

Prior to and on May 24, 1940, the bonds involved in this action were owned by four Netherlands domiciliaries. On that date the government-in-exile issued Royal Decree A–1, which purported to vest protective title in plaintiff to all securities belonging to persons domiciled in the Kingdom of the Netherlands for the purpose of conserving the rights of the former owners. It is upon this enactment that plaintiff rests its claim to the bonds in dispute.

Shortly after the occupation of Holland, the German invader set about his nefarious campaign to eliminate Jewish influence from that nation's economic life. As one of the steps in this campaign, an ordinance was promulgated on April 8, 1941, compelling Jewish residents to deposit all negotiable assets, including cash and securities, with a designated German office. The four bonds involved in this action were among the assets thus deposited, having been owned by Jewish nationals of the Nether-

lands at the time of the German invasion. Two of them were thereafter transferred to a German foundation established to collect liquidated Jewish capital; the German Postal Service for the Occupied Netherlands obtained the other two. In the latter part of 1943, the deposited securities, including these four bonds, were sold on the Paris black market by an agent of the German Government, the proceeds being credited to the account of the German Representative with The Netherlands Bank.

The four bonds at issue were subsequently acquired by a Swiss firm known as Arbitrium. In October, 1946, this firm had sold some American corporate securities at a discount to the interpleaded defendant, Archimedes, who was then in Switzerland. These securities were sent to him at his home in San Francisco, where he disposed of them through local brokerage firms. The following January, Arbitrium cabled Archimedes, offering to sell him more such securities. He thereupon left the United States for Switzerland to complete the purchase, which included the four disputed bonds. A third purchase was made the following month; and, while Archimedes was preparing to make a fourth, he was apprehended by United States Government officials and indicted for violating federal foreign funds regulations in connection with these transactions. He thereupon deposited the securities still in his control, including the four bonds involved here, with the defendant Federal Reserve Bank, as required by the Treasury Department's General Ruling No. 5, 5 Fed.Reg. 2159, as amended, 8 CFR 511.205.

After a trial without a jury the district court held, on the basis of these facts, that neither plaintiff nor Archimedes was entitled to the bonds at issue. Accordingly, the court ordered the bonds returned to defendant's custody "to await the appearance of proper claimants, or other appropriate disposition." D.C.S.D.N.Y., 99 F. Supp. 655, 670.[2] Both claimants appeal from this judgment insofar as it denies

2. Previously another district judge had upheld the sufficiency of the complaint, primarily on the basis of Anderson v. N. V. Transandine Handelmaatschappij, 289

N.Y. 9, 43 N.E.2d 502, discussed below. State of the Netherlands v. Federal Reserve Bank of N. Y., D.C.S.D.N.Y., 79 F.Supp. 966.

their respective rights to the securities. Since plaintiff concedes that it cannot prevail if a valid claim is made by a subsequent holder in due course, we consider first Archimedes' asserted right to the bonds.

## I. The Claim of Archimedes

█ The district court's determination against Archimedes was based on two alternative grounds. No valid claim to the bonds can be asserted, the court held, because of Archimedes' violation of freezing control legislation and regulations in acquiring them. Being somewhat uncertain of this conclusion, however, the court also held that even if the freezing orders did not apply, Archimedes was not a holder in due course of the securities. We agree with the court on both grounds, each of which conclusively disposes of Archimedes' claim.

Pursuant to § 5(b) of the Trading with the Enemy Act of 1917, 12 U.S.C.A. § 95a, the President on April 10, 1940, signed Executive Order No. 8389, 5 Fed.Reg. 1400, reprinted in the note to 12 U.S.C.A. § 95a. The pertinent portion of this Order provides:

"Section 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise, if * * * such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect:
* * * * * *
"E. All transfers, withdrawals or exportations of, or dealings in, any evidences of indebtedness or evidences of ownership of property by any person within the United States; and

"F. Any transaction for the purpose or which has the effect of evading or avoiding the foregoing prohibitions."

The Netherlands was included as a "foreign country designated in this Order" by Executive Order No. 8405, 5 Fed.Reg. 1677, 12 U.S.C.A. § 95a note. Archimedes' purchase of the securities here involved clearly constituted a "transfer" of "evidences of indebtedness." This transaction was never licensed or otherwise authorized. The question then remaining to be decided was whether the order reached to Archimedes under the circumstances, and, if so, whether a violation rendered Archimedes' title to the bonds invalid.

Before, however, we consider the district court's chain of reasoning in reaching an affirmative result, we will note that since its decision we have upheld a Treasury ruling which reaches the same result more simply and directly. Treasury Department General Ruling No. 12, 7 Fed.Reg. 2291, 8 CFR 511.212, provides: "(1) Unless licensed or otherwise authorized * * * (b) no transfer after the effective date of the Order shall be the basis for the assertion or recognition of any right, remedy, power, or privilege with respect to, or interest in, any property while in a blocked account (irrespective of whether such property was in a blocked account at the time of such transfer)." If this provision may operate according to its terms, Archimedes' purchase falls squarely within its purview and thus could not operate to give him any interest in the bonds. In Orvis v. McGrath, 2 Cir., 198 F.2d 708, we held the Ruling to be within the scope of Executive Order No. 8389, supra, and properly authorized by § 5(b) of the Trading with the Enemy Act. But since the Supreme Court has granted certiorari in this case, Orvis v. McGranery, 73 S.Ct. 283, we shall also review the grounds on which the district court based its decision.

Unquestionably Archimedes would have violated subsec. E. of the Executive Order, had he been in the United States at the time he consummated the purchase. Plaintiff and the United States, as *amicus curiae,* urge that Archimedes' physical presence here was not essential for a violation of the Order because its application to "any person within the United States" should be construed to encompass all persons subject to the jurisdiction of the United States. As an American citizen, Archimedes would fall into the latter category, no matter where his travels led him. See, e. g., Ver-

milya-Brown Co. v. Connell, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76; Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375. But we need not decide this question, since subsec. F. foreclosed the possibility of escaping the reach of the Order here. It seems to us apparent that Archimedes' special trip to Switzerland to negotiate this purchase had "the effect of evading or avoiding" the Order's provisions in violation of subsec. F. if the transfer was not proscribed by subsec. E.

The effect of this violation upon the validity of the title Archimedes claims to have acquired by virtue of his purchase raises a more troublesome question. Several Supreme Court decisions have analyzed the impact of Executive Order No. 8389, as amended, on claims derived from unlicensed transactions. None of these, however, involved dealings in looted securities. In Propper v. Clark, 337 U.S. 472, 486, 69 S.Ct. 1333, 1341, 93 L.Ed. 1480, affirming Clark v. Propper, 2 Cir., 169 F.2d 324, a statutory receiver appointed after the "freeze" date under § 977–b of the N. Y. Civil Practice Act laid claim to royalties owed by a New York debtor to an enemy association. The Alien Property Custodian subsequently issued an order vesting these assets in himself as enemy property. Holding the post-freezing appointment of the receiver ineffective to transfer title to him, the Court said: "We do not now undertake to say whether every determination of rights concerning blocked property in unlicensed litigation is voidable. We base our determination on the purpose of Congress to prevent shifts in title to blocked assets and the prohibition of the Executive Order against transfers of such a credit as this." See also Bernstein v. N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 2 Cir., 173 F.2d 71.

On the other hand, in Lyon v. Singer, 339 U.S. 841, 842, 70 S.Ct. 903, 904, 94 L.Ed. 1323, the Supreme Court acceded to the holding of the New York Court of Appeals that claims against a statutory bank liquidator were entitled to a preference under N. Y. Banking Law, McK.Consol.Laws, c. 2, § 606, despite the fact that these claims arose from blocked transactions with an enemy corporation. In its opinion the Supreme Court noted that "[s]ince the New York court conditioned enforcement of the claims upon licensing by the Alien Property Custodian, federal control over alien property remains undiminished." The Court then proceeded to distinguish its earlier decision in Propper v. Clark, supra, as follows: "There the liquidator claimed title to frozen assets adversely to the Custodian, and sought to deny the Custodian's paramount power to vest the alien property in the United States. No such result follows from the New York court's judgments in the present cases." 339 U.S. 841, 843, 70 S.Ct. 903, 904, 94 L.Ed. 1323.

The two cases of Zittman v. McGrath, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096, and 341 U.S. 471, 71 S.Ct. 846, 95 L.Ed. 1112, also involving amended Executive Order No. 8389, and upon which Orvis v. McGrath, supra, depends, were decided after the district court rendered its opinion in the instant case. In the first of these cases the Court held that an attachment levy, valid as a matter of state law, remains unimpaired when the Alien Property Custodian in effect steps into the enemy debtor's shoes by vesting in himself simply the right, title, and interest of the enemy. "This result," the Court took pains to point out, "in no way impairs federal control over alien property, since the petitioners admit that they cannot secure payment from the attached frozen funds without a license from the Custodian." 341 U.S. at page 464, 71 S.Ct. at page 842, 95 L.Ed. 1096. The second Zittman decision held that where the Custodian employed a "turn-over directive," i. e., a *res* vesting order, he was entitled to possess himself the blocked funds and to administer them. The Court did not, however, pass upon "the effect of such substitution of custody upon the attaching creditors' rights." 341 U.S. at page 473, 71 S.Ct. at page 847, 95 L.Ed. 1112. Presumably it will do so in its review of the Orvis case, where we held that a vesting order did render an unlicensed attachment ineffective to transfer any interest in the blocked property.

Analysis of these Supreme Court decisions leads us to the conclusion that they

are clearly reconcilable and imply a simple and logical rule of law: an unlicensed transaction will be considered a nullity whenever such a result best effectuates the purposes of the federal freezing program.[3] Applying this criterion to the purposes of the Government's program set forth in the first Zittman case, 341 U.S. at pages 453–454, 71 S.Ct. at page 837, 95 L.Ed. 1096, in quotation from the Government's brief as *amicus curiae* in Commission for Polish Relief v. Banca Nationala A Rumaniei, 288 N.Y. 332, 43 N.E.2d 345, we find the first purpose, protecting property of persons in occupied countries, directly applicable. Also relevant is Point 5 referring to foreign relations including postwar negotiations and settlements, in view of our international commitments to assist in the recovery of looted securities.[4] On the other hand, Point 4, protection of American creditors, does not avail Archimedes, since that protection appears designed for such creditors as were involved in Zittman v. McGrath, supra, rather than purchasers of looted bonds. Moreover, permitting Archimedes to lay claim to these bonds as an American creditor would completely frustrate accomplishment of the first objective, namely, protecting the victims of the looting.

We hold, therefore, that the rule enunciated by the Supreme Court in Propper v. Clark, supra, and the other cited cases compels the conclusion that Archimedes obtained no title through his unlicensed purchase.

Since the district court was somewhat uncertain of the effect of Lyon v. Singer on the rule of Propper v. Clark, it went on to consider Archimedes' claim without reference to the freezing regulations. It held that he failed to demonstrate that he, or a person through whom he claims, was a holder in due course under the applicable law of New York, the Netherlands, or Switzerland. We agree. The bases for the court's decision on this issue are fully and lucidly set out in its opinion and require no elaboration here. Suffice it to say that the evidence clearly justified the court's finding to the effect that Archimedes took the bonds with willful ignorance of their origin—if indeed he was not less ignorant than he was willing to admit. He could therefore not claim title as a holder in due course under N. Y. Negotiable Instruments Law § 91, see Manufacturers & Traders Trust Co. v. Sapowitch, 296 N.Y. 226, 72 N.E.2d 166, or under the appropriate provisions of Dutch and Swiss law as found by the district court.[5]

## II. The Claim of the State of the Netherlands

The basis upon which plaintiff State of the Netherlands rests its claim to the bonds is the Royal Decree A–1 promulgated by

3. Although the Lyon case distinguished Propper v. Clark on the narrower ground that the latter involved the Alien Property Custodian, the language and reasoning in both opinions suggest that the Court did not intend to hinge the invalidity of post-freezing transactions solely on the presence of the Custodian. Moreover, the Lyon and first Zittman decisions both emphasize that obtaining a federal license constitutes a condition precedent to enforcement of the claims there asserted; the record here, however, does not even remotely suggest that Archimedes could ever obtain such a license and on the facts before us we are confident in assuming that such a possibility is quite illusory.

4. "The policy of restoring enemy looted securities * * * was expressed in the Inter-Allied Declaration Regarding Forced Transfers of Property in Enemy-Controlled Territory, of January 5, 1943, and in Resolution No. VI of the United Nations Monetary and Financial Conference held at Bretton Woods July 1 to 22, 1944, in both of which the United States joined." Dept. of Justice Press Release, Jan. 19, 1951.

5. A question of at least considerable academic interest is presented by the case, namely, as to whether New York law (and precedents) or federal law prevails. The parties have assumed throughout that New York rather than federal law is pertinent, despite the fact that federal jurisdiction was invoked not on the basis of diversity of citizenship, but under 12 U.S.C. § 632. We need not, however, decide the question, since the result is the same in either case. See Clark, State Law in the Federal Courts: The Brooding Omnipresence of Erie v. Tompkins, 55 Yale L. J. 267.

its wartime government-in-exile. Article I of this decree provides in pertinent part:

"1. Title to claims against persons, partnerships, companies, corporations, firms, institutions and public bodies, which claims belong to natural or legal persons domiciled in the Kingdom of the Netherlands, * * * in so far as these claims are in any form whatsoever capable of being encumbered, pledged, transferred or sold or the like, outside of the Realm in Europe, is hereby vested in the State of the Netherlands, as represented by the Royal Netherlands Government, temporarily resident in London and exercising its functions there. * * *

"2. * * *

"3. The proprietary rights vested in the State of the Netherlands, by virtue of the provisions of the preceding paragraphs, shall only be exercised for the conservation of the rights of the former owners."

The issue before us is whether this decree is effective to permit plaintiff to recover the disputed bonds.

The broad question of the effect of decrees of governments-in-exile seems only just beginning to acquire deep significance in our law. There is a single American precedent, upholding this decree with respect to property located in New York at the time of its enactment and holding invalid a subsequent levy of attachment on the property in a suit against the original owners. Anderson v. N. V. Transandine Handelmaatschappij, 289 N.Y. 9, 43 N.E.2d 502. The English courts appear to have expressed somewhat diverse views as to property located in England. Thus a similar Norwegian decree was upheld in Lorentzen v. Lydden & Co., [1942] 2 K.B. 202, while this very decree was not enforced in Bank voor Handel en Scheepvaart v. Slatford, [1951] 2 All E.R. 779 (K.B.). Compare critical comment on this latter case and the decision below in 65 Harv.L. Rev. 1463.

The Anderson case was relied on in the original decision herein sustaining the validity of the complaint, D.C.S.D.N.Y., 79 F.Supp. 966, although it was held inapplicable by Judge Goddard in his decision, D.C.S.D.N.Y., 99 F.Supp. 655. It has been extensively discussed by the parties before us and deserves careful consideration. The court there said, 289 N.Y. at page 19, 43 N.E.2d 502, 506:

"There can be no doubt that the decree of May 24, 1940, promulgated by the recognized government of the State of the Netherlands is part of the law of a friendly sovereign State of which the defendants are subjects and in which the defendants are domiciled, and that under such law title to the property described in the decree belonging to the nationals and residents of the State of the Netherlands (including the property upon which the sheriff has attempted to levy), is vested in the State of the Netherlands. By comity of nations, rights based upon the law of a foreign State to intangible property, which has a situs in this State, are recognized and enforced by the courts of this State, unless such enforcement would offend the public policy of this State."

The court then proceeded to find that the Netherlands decree was not confiscatory and did not violate the public policy of New York State or that of the United States as formulated by the State Department for the court's benefit.

We deem the Anderson holding an accurate statement of the law we should apply in the present case. It was thoroughly in accord with the international policy of our government; and, although the contrary was vigorously urged, it appears to us still a correct exposition of our policy. Thus press releases issued by the United States Department of State on January 19, 1951, and by the Department of Justice on the same day and as recently as October 4, 1951, all recognize the right of the Netherlands Government to claim looted securities held in the United States.

The ground upon which the district court held the Anderson rule inapplicable was that it concerned securities held in the United States, while the bonds here involved were held in the Netherlands at the

time Decree A-1 was enacted. But this fact is not of decisive significance. The physical location of bonds does not determine their situs for all purposes. In Cities Service Co. v. McGrath, 342 U.S. 330, 72 S.Ct. 334, 336, affirming McGrath v. Cities Service Co., 2 Cir., 189 F.2d 744, decided after the decision below, the Supreme Court held that debts evidenced by bearer bonds of United States corporations were located "within the United States," thus permitting them to be vested under the Trading with the Enemy Act, despite the fact that the certificates were outside the United States. Determining the situs of the debt by the residence of the debtor, rather than the location of the bonds, seems to us quite as appropriate for that aspect of the wartime foreign assets problem which is involved here. The Supreme Court in the Cities Service case pointed out in words prophetically applicable here that employment there of the "fiction" that a bond has no existence apart from its certificate would "defeat the recovery of American securities looted by conquering forces." 342 U.S. at page 333, 72 S.Ct. at page 336. Of course we would endeavor to protect the rights of the original Dutch owners or their legitimate assignees to ultimate possession of their Nazi-confiscated securities if they were left to secure for their own property as best they could. But it seems clearly preferable to recognize the claim to protective possession by this plaintiff under its obligation to act only for the conservation of the rights of the former owners than to force the possibly complicated unscrambling of these rights upon American courts. See 100 U. of Pa.L.Rev. 764, 767, in criticism of the decision below on this point.

Again, it may be conceded that a traditional and widely held view places the situs of a debt at the locus of the certificate evidencing it. But as Judge L. Hand aptly noted in his opinion in the Cities Service case in 189 F.2d at pages 746, 747, this doctrine has already lost much of its early vigor. It may still find utility in many connections. But as applied to the problems occasioned by the looting of securities by a conquering power, we believe the domicile of the corporate debtor is a much more significant point of contact than the location of the bond instrument. See 50 Mich.L. Rev. 1057, 1066.

The Netherlands decree should be given effect, however, even if the situs of these bonds were deemed inseparable from the certificates. The district court based its decision to the contrary on the theory that international law bars recognition of such an enactment by an absent sovereign over property located within its occupied territory. The traditional sources of international law—treaties, precedent, custom, and commentary—are somewhat meager and not completely decisive on this issue. But modern authority as we view it points to the enforceability of this decree under international law.

The nineteenth century American view that military conquest completely displaced the sovereignty of the prior possessor, see, e. g., United States v. Rice, 4 Wheat. 246, 17 U.S. 246, 254, 4 L.Ed. 562; Fleming v. Page, 9 How. 603, 50 U.S. 603, 612, 13 L.Ed. 276, was substantially modified by the Regulations respecting the Laws and Customs of War on Land, ratified by the United States as an annex to the Fourth Hague Convention of 1907, 36 Stat. 2277, 2295. Since the adoption of these Regulations it is generally agreed that the occupant does not succeed to sovereignty over the occupied territory, but has only limited administrative authority. 6 Hackworth, Digest of International Law 385-6; Oppenheimer, Governments and Authorities in Exile, 36 Am.J.Int'l L. 568, 571. Article 43 of the Regulations specifies that authority as follows: "The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country." The word "safety" in this article is not a literal translation of "la vie publique," the expression used in the original French version, and a somewhat broader concept may have been intended. Schwenk, Legislative Power of the Military Occupant under Article 43, Hague Regulations, 54 Yale L.J. 393; the author of this

462

article suggests that "civil life" would more accurately reflect the intent of the draftsmen. Id. at 393, n. 1. Be that as it may, the occupant's legitimate legislative authority is limited to necessary administrative measures, see Aboitiz & Co. v. Price, D.C.Utah, 99 F.Supp. 602, and is circumscribed by various other provisions in the Regulations, of which the prohibition against confiscation of private property is the most directly relevant here. See Comment, The Law of Belligerent Occupation in the American Courts, 50 Mich.L.Rev. 1066, 1071; Note, 65 Harv.L.Rev. 527.

While it is clear that the preoccupation laws outside the legitimate scope of the occupant's control remain in force, Hague Regulations, Art. 43; Schwenk, supra at 406, the effectiveness of the absent sovereign's new legislation is not quite as certain. The Hague Regulations do not explicitly deal with this problem. Several foreign courts have, however, considered the issue; and, so far as we have been able to find, only those of Greece have refused to give effect to enactments of the legitimate sovereign applying to the occupied territory. See Occupation of Cavalla, Greece: Court of Thrace (1930), Annual Digest 1929–30, No. 292. All the others recognize the validity of such legislation, e. g., Agrocide v. Arsocid, Holland: Court of Appeal, The Hague (1946), Annual Digest 1947, No. 142; Public Prosecutor v. Reidar Haaland, Norway: Supreme Court, Appellate Division (1945), Annual Digest 1943–45, No. 154; Re Hoogeveen et al., Belgium: Court of Cassation (1944), Annual Digest 1943–45, No. 148; Stasiuk and Jagnycz v. Klewec, Poland: Supreme Court, Third Division (1927), Annual Digest 1927–28, No. 380; De Nimal v. De Nimal, Belgium: Court of Appeal of Brussels (1919), Annual Digest 1919–22, No. 311. Pitted against the array of precedent cited, the Cavalla case does not seem to us to merit the reliance the district court placed upon it.

In support of its decision, the court below also pointed to a dictum in the De Nimal case to the effect that hostile measures aimed at combating the occupant and hampering his rule would not apply to occupied territory. Such a limitation appears quite reasonable, indeed essential; but rather than suggesting the ineffectiveness of the Netherlands decree, it supports our contrary conclusion. Obviously, absentee legislation intended to interfere with the occupant's *legitimate* rule should not be given effect. Otherwise the authority vested in the occupying power by Article 43 of the Hague Regulations would become nugatory. Mere hostility to the occupant should not, however, invalidate the absent sovereign's enactments. To have such an effect the hostile legislation must be directed against those aspects of governmental control which international law vests in the occupant. In short, the legitimate sovereign should be entitled to legislate over occupied territory insofar as such enactments do not conflict with the legitimate rule of the occupying power. This view is suggested by at least one prominent commentator on international law, who writes: "Principle seems to demand that, assuming the new law to fall within the category of that large portion of national law which persists during the occupation and which the enemy occupant cannot lawfully change or annul, it ought to operate in occupied territory." McNair, Municipal Effects of Belligerent Occupation, 57 L.Q.Rev. 33, 73; see also McNair, Legal Effects of War 382–3 (3d Ed.1948). Somewhat similar is the position taken by Feilchenfeld in The International Economic Law of Belligerent Occupation 135 (1942), except that he would recognize absentee legislation in those fields not actually pre-empted by the occupant rather than those within his legal authority: "Nevertheless, one would go too far in assuming, as has been done by various authorities, that an absent sovereign is absolutely precluded from legislating for occupied areas. The sovereignty of the absent sovereign over the region remains in existence and, from a more practical point of view, the occupant may and should have no objection to timely alterations of existing laws by the old sovereign in those fields which the occupant has not seen fit to subject to his own legislative power."

It has been pointed out, moreover, that refusal to recognize any new legislation by the displaced sovereign, while limiting the

occupant's rule to the authority granted in Article 43 of the Hague Regulations, may well result in a hiatus of legislative control in fields inadequately covered by pre-existing enactments. Stein, Application of the Law of the Absent Sovereign in Territory under Belligerent Occupation: The Schio Massacre, 46 Mich.L.Rev. 341, 362. This author offers the rather utopian suggestion that the occupant's recognition of legislation by the absent sovereign in this no man's land would provide one possible solution. Stein also notes the "modern tendencies in the British and American doctrine which require the occupant to give the widest possible application in occupied territory, within the limits of his legitimate military interests, to 'absent' sovereign's [sic] 'new' laws." Id. at 370. Thus it is apparent that the commentators do not view international law as precluding all recognition of absentee decrees; and our own interpretation reconciles the Hague restrictions on the occupant with the need for continuous legislation in all fields of government control.

█ In view of the vagueness of Article 43, it may occasionally be difficult in a particular case to determine where the occupant's authority ends and that of the absent sovereign begins. But that determination is greatly simplified here by Article 46 of the Hague Regulations, prohibiting confiscation of private property by the occupant. Decree A–1 was aimed directly at preventing or at least discouraging such illegal seizure; hence, while unquestionably a "hostile" measure, it merely implemented a restriction upon the occupant, rather than interfered with his legitimate rule. See Stein, United States: Recovery of Property Confiscated by Enemy Occupant, 1 Am.J. Comp.L. 261, 266. The fact that this decree put purchasers of foreign securities on notice to exercise greater care in ascertaining their vendor's title than is ordinarily required does not seem to us a sufficient interference with the occupied nation's economic life to render the measure invalid. Nor should we deny enforcement simply because the decree was not so successful in accomplishing its purpose of preventing enemy looting as its authors may have wished; such enactments would become all the less effective in the future if we were to refuse recognition here. Since Decree A–1 does not conflict with any legitimate legislation or regulation of the occupant or with our own public policy, we see no reason why it should not be given effect in the present case. See 65 Harv.L. Rev. 1463, 1464. This conclusion receives further support from the fact that, so far as appears, the claim of the Netherlands does not compete with any valid rights of United States residents.

We may add that the conclusion to which we find ourselves impelled by current doctrines of international law seems to us more necessary and appropriate to the world to which we have come than the mid-nineteenth century view followed below.

The judgment is accordingly affirmed as to Archimedes, but is reversed as to the State of the Netherlands; and the district court is directed to enter judgment for the State of the Netherlands.