Zuheir HUSSEYNI, Plaintiff,

v.

Fred RAPPAPORT, Defendant.

Civ. A. No. 4001.

United States District Court,
D. Minnesota, Fourth Division.

Nov. 24, 1954.

James B. Hannah, of Mackall, Crounse, Moore, Helmey & Palmer, Minneapolis, Minn., for plaintiff.

Benedict Deinard and S. Harry Gainsley, Minneapolis, Minn., for defendant.

NORDBYE, Chief Judge.

Plaintiff brings this action to recover on a check in the amount of $10,000, dated October 2, 1950, drawn by defendant upon the First Produce State Bank, Minneapolis, Minnesota, payable to the order of one Mr. George Dawson. The check purportedly has the endorsement of the payee as follows: "G. Dawson" and "George Dawson". Plaintiff, a resident of Damascus, Syria, contends that he is a bona fide holder in due course and for value of the check in question.

On October 2, 1950, at Frankfort, Germany, defendant entered into an agreement with a concern in that city known as Trucks and Spares Kraftfahrzeug for the purchase of 400 half-tracks at a total price of $48,000. Among the conditions set forth in the contract of purchase was the agreement of Trucks and Spares that the validity of the agreement would depend upon the granting of an export permit and the obtaining of a release from Steg, the German concern which apparently handled the disposition of United States surplus war material. At the time the contract was entered into, Rappaport was induced by Trucks and Spares to deliver five checks as purported evidence of his good faith. The contract provided that, upon completion of the transaction, these checks were to be replaced by certified checks on the Chase National Bank of New York City. Consequently, it is clear that it was not in the contemplation of the parties that the five checks would be negotiated. The undisputed evidence on behalf of Rappaport established that the half-tracks

never were made available for export, and the seller failed to fulfill the conditions of the contract for sale as to delivery. Upon discovery of the apparent fraud perpetrated upon him, Rappaport cabled the Minneapolis bank upon which the checks were drawn to stop payment. One of the five checks involved in the half-track transaction, delivered as aforestated, is the check which is the subject of this action.

During the early part of August, 1950, plaintiff was in Cairo, Egypt, on business for his firm, Beyhum & Company, primarily for the purpose of obtaining army surplus for the Syrian government. At his hotel he engaged in conversation with two strangers, who introduced themselves as Mr. Dawson and Mr. Pavie, the latter representing himself as the secretary and business associate of Dawson. Pavie stated that they had come to Egypt to buy army surplus and that they were in a position to sell army surplus trucks, an inventory of which he would make available to plaintiff. However, the inventory was not furnished, and when plaintiff met them two days later they stated that they were going to return to Europe. Plaintiff remained in Cairo, and on or about October 10, 1950, he received a call from Pavie, who apparently had returned to Cairo alone, and at Pavie's request he called at Pavie's hotel room. The conversation between them at this time is related by Husseyni in his deposition as follows:

"Q. Give us the conversation. A. He [Pavie] said 'I have come to buy what I have seen,' and asked me to assist him. This because he asked about me and found out that I am reliable. I answered him that I have no time for this kind of business because I am leaving in a day or two. He tried to convince me but I refused and told him I was leaving and I left him. At noon I saw him again. He told me if you please assist me in the sale of these checks. He showed me a check for $10,000, another certified check for $5,000, and two travelers checks each for $100. He asked

me about the price of the dollar. I told him the price of the dollar is 39 Egyptian piasters. He said that the price of the dollar is more than that. I telephoned and asked about the price of the dollar and it was 39 piasters.

"Q. Whom did you phone to ask? A. I rang up Bashir Moheish, the manager and partner of Habbal and Koussa in Cairo and asked him about the price of the dollar. He said 39–39¼ Egyptian piasters to the dollar. Then Pavie said 'Would you buy the checks?' I asked him to hand them to me and to be away for one hour and to give him my answer after that. I took the checks and went to Habbal and Koussa.

\* \* \* \* \* \*

"Q. What did you do with the checks? A. I took these checks to Bashir Moheish and told him that I wanted to sell them. Bashir said that there was no question about the $5,000 check and those of $200 but that of $10,000 he had a doubt as far as its payment is concerned. And he said, 'Are you sure that the one who issued the $10,000 check has a balance at the bank to cover the amount of the check?'

"Q. What did you say? A. This same question I had asked Pavie who told me that the issuer of the check was a very, very rich man and Pavie added that 'I myself am staying in Egypt for one or two months, if it's not paid I am here.' I thought as long as Pavie is here I can get hold of him.

"Q. So what did you tell Moheish? A. Moheish said, 'I am ready to give you their worth provided you will give me a letter in exchange guaranteeing the payment of any of these four checks.' I gave him the letter, he took the checks and paid me their value."

However, Moheish denies in his deposition that he received any written guaranty as to the payment of these checks;

he contends that he merely cashed them as a favor to Husseyni. There is another conflict in the depositions of these two men. Husseyni contends that the full rate of exchange in Egyptian pounds was paid for the $10,000 check. Moheish testifies that all the checks were taken at about a thirty per cent discount. Husseyni further testified that the only arrangement he had with Moheish for any consideration for the part he played in the transaction was that he should be able thereafter to obtain from Moheish dollars at the same rate of exchange when he needed dollars for his export business.

The $10,000 check as delivered to Husseyni and Moheish was endorsed "G. Dawson" and under that signature "George Dawson". After the purchase of the checks, there was written by Moheish above the signature of G. Dawson, "Pay to the order of Habbal and Koussa," and the check was taken by messenger to Damascus, Syria, and later forwarded to the Chase National Bank. When the check was presented for payment at the Produce State Bank, Minneapolis, the bank had received the cable from Rappaport stopping payment on the check, and the check was dishonored, therefore, and returned to Moheish, who was then reimbursed by Husseyni in the amount that had been paid for this check. Husseyni testifies that he asked Moheish to endorse the check to him, but Moheish demurred and thereupon Moheish crossed out the words "Pay to the order of Habbal and Koussa" and also "Pay to the order of Chase National Bank" and informed Husseyni that he could write after the second signature of Dawson the words "Pay to the order of Zuheir Husseyni." This was done. Thereupon the check was endorsed by Husseyni with a notation "Pay to the order of Rafidain Bank of Damascus" and the check was presented again to the Produce State Bank for payment and later was protested for non-payment.

It appears from the deposition of one Roger Gued, barrister at the courts of Egypt, that the negotiation of the Rappaport check in Egypt by Pavie to plaintiff and to Moheish was in violation of the Egyptian Currency Control Law No. 80 of 1947, as amended by Law No. 157 of 1950, Articles 1 to 3, and Arrete No. 51, 1947, which forbids non-residents who bring foreign paper or currency to Egypt from transferring it within that country except through an authorized Egyptian bank. That Husseyni and Moheish were aware of this restriction in the Egyptian law is evident.

The evidence before this Court is sufficient to establish that plaintiff was the last person to acquire the check in question, and since counsel who presented the check in court stated that he was in custody of the check in behalf of plaintiff, there can be no question but that plaintiff presently is in possession of the check. Defendant contends, however, that plaintiff cannot be the legal owner of the check because (1) there is no proof that the payee ever endorsed the check; (2) Husseyni never bought the check at all but only acted as a messenger between Moheish and Pavie; (3) when plaintiff got the check back from Moheish after it was dishonored, he was acting in behalf of his firm, Beyhum & Company, and since under the law of Syria Beyhum & Company is a juristic person, it is that concern and not plaintiff who became the lawful holder of the check; and (4) the attempted negotiation of the check in Egypt was in violation of the Egyptian Currency Control Law, and therefore plaintiff acquired no title.

The first contention seems devoid of merit. Minnesota Statutes, 1953, Section 600.15, M.S.A., provides that possession of a bill of exchange is prima facie evidence that the same was endorsed by the person by whom it purports to be endorsed. It is true that the statute applies only in actions "brought * * * by the endorsee." But in the case of paper endorsed in blank, the "endorsee" must include whoever is the lawful bearer of the instrument. And in deciding whether plaintiff is the lawful bearer so as to raise the presumption of the statute, the contention that he did not take title because the authenticity of the endorse-

ment upon which he relies has not been established is unavailable to the defendant. There is nothing in the record which suggests that the endorsement in blank in the name of George Dawson was not in fact made by him.

Defendant next contends that plaintiff was not a purchaser, but a mere check broker. Admittedly, there is considerable uncertainty as to the nature of Husseyni's interest in these checks when they first were negotiated. Husseyni states that he sold them to Moheish, but, as indicated heretofore, Moheish states that he cashed them for Husseyni merely on a "friendly basis." However, it would seem that the facts indicate that plaintiff ultimately was the purchaser of the check although he may have been at first a mere intermediary between Pavie and Moheish. Apparently Pavie and Moheish never met. Pavie probably never knew that Moheish had any interest in the purchase. Plaintiff testified that he considered himself the purchaser and Moheish testified that neither he nor his firm, Habbal and Koussa, purchased the check, but acted only as Husseyni's agent for collection. In any event, whatever Husseyni's status may have been when the check first was presented for payment by Habbal and Koussa, it would seem that in carrying out his promise to Moheish, whether in writing or not, Husseyni acquired the check.

The fact that the funds for the purchase may have been furnished to plaintiff by his firm, Beyhum & Company, seems immaterial. The Uniform Negotiable Instruments Law, Minn.Stat.1953, Sec. 335.20, M.S.A. allows a "holder" of a negotiable instrument to sue thereon in his own name, and Minn.Stat.1953, Sec. 335.01, M.S.A., defines a "holder" as the payee or endorsee of a bill or note who is in possession of it or the bearer thereof. Further, these same sections define "bearer" as the person in possession of a bill or note payable to bearer. Under these sections, therefore, Husseyni appears to be the holder of the check in question, and the decided weight of authority is that in an action upon a negotiable instrument, plaintiff need only allege that he is the holder and not that he is the beneficial owner thereof. Britton, Bills and Notes, Section 77 (1943); Brannan, The Negotiable Instruments Law 159–160 (3d Ed.1920). An agent for collection, whether he acquires title under a restrictive endorsement, Citizens' State Bank of Hamilton v. E. A. Tessman & Co., 1913, 121 Minn. 34, 140 N.W. 178, 45 L.R.A.,N.S., 606, or under a blank or special endorsement, may sue in his own name in spite of the requirements of a real party in interest statute. Farmers National Bank of Waseca v. Brown, 1936, 198 Minn. 195, 269 N.W. 409. Since plaintiff is the nominal holder of the instrument, and since he presumably has authority to collect the check for the ultimate benefit of his company, he is the proper party to bring this action.

In light of the fact that the transfer of the check by Pavie to Husseyni and by Husseyni to Moheish was declared illegal by the Egyptian law, does plaintiff have a sufficient interest in the check to maintain this action? It seems reasonably clear from Gued's deposition that under Egyptian law the attempted transfer would have subjected the participants to various sanctions, including the possible confiscation of the check. But it is to be doubted whether this apparent or possible defect in plaintiff's title is available to defendant. Cases have arisen in which it was determined that the transaction in which plaintiff obtained the instrument was a legal nullity due to the prohibitions of a statute, and that therefore the plaintiff could not recover from the maker. See State of the Netherlands v. Federal Reserve Bank, 2 Cir., 1953, 201 F.2d 455 (violation of Trading with the Enemy Act, 12 U.S.C.A. § 95a); Holman v. Ringo, 1859, 36 Miss. 690 (instrument transferred in violation of statute making gambling transactions void); Robertson v. Furness, 43 U.C.R.,Q.B. 143 (Can.1878) (violation of public policy against attorney taking security for future services). However, where the

illegality of the transaction does not make the transaction void but only voidable, the rule seems to be that illegality is not a defense available to the maker. In Haugan v. Sunwall, 1895, 60 Minn. 367, 62 N.W. 398, it was held that the negotiation of defendant's note by the cashier of a bank in violation of the insolvency law was voidable only and therefore could not be asserted by the defendant to defeat recovery.

These general rules are modified by a number of cases which ignore the effect of the illegality upon plaintiff's title but rather deny him the right to recover on grounds of public policy. For example, although the weight of authority is that the winner of a negotiable instrument in a gambling transaction may notwithstanding the illegality of the transfer recover thereon from the maker, see Britton, supra, § 160, at pages 766–768, numerous courts have taken a different view, primarily upon the ground that courts should not lend their aid to a participant in an unlawful transaction where there is an attempt to recover on his illegal gains. See Haller v. Workingmen's Co-op Bank, 1928, 263 Mass. 37, 160 N.E. 324, 56 A.L.R. 1320; Brinley v. Williams, 1941, 189 Okl. 183, 114 P.2d 463; Mashek v. Leonard, Tex.Civ.App.1945, 186 S.W.2d 745. Similarly, it has been held that where the holder of notes gets them from the payee in consideration of illicit relations between them, plaintiff cannot recover on the notes. Baker v. Sockwell, 1926, 80 Colo. 309, 251 P. 543. On the other hand, violations of a statute regulating the sale of intoxicating liquors, Gould v. Leavitt, 1899, 92 Me. 416, 43 A. 17, or of a State Insurance Act prohibiting rebating, Bookmyer v. Davies, 1913, 69 Pa.Super. 240, the defense of a violation of the statute was not available to the maker of the note. And it is well settled that a note negotiated by a foreign corporation payee in a State where it was not authorized to do business is enforcible in the hands of an endorsee although the corporation would be subject to the penalty provided by a statute relating to foreign corporations. E. g.,

Finseth v. Scherer, 1917, 138 Minn. 355, 165 N.W. 124.

In the case at bar, the evidence clearly discloses that the attempted transfer by Pavie to the plaintiff was forbidden by Egyptian law. And defendant points to Articles 135 and 136 of the Egyptian Code—which declares void any contract whose object or consideration is contrary to public policy—as preventing plaintiff from acquiring title sufficient to support this lawsuit. It may be assumed that Husseyni's title depends upon the effect of the violation of the Currency Control Law. However, there is no showing here that that violation is contrary to the "public policy" of Egypt within the meaning of Articles 135 and 136. In one sense, any statute of a given state represents a statement of its public policy. But "public policy" is a nebulous and fluctuating term. It would be sheer speculation if this Court held that the violation of the law here involved would be held by the Egyptian courts to be the kind of abridgment of public policy which would invalidate the transaction and prevent Husseyni from acquiring legal title to this instrument. Moreover, the only expert testimony as to the effect of the Currency Control Law on the passage of title is contained in the deposition of Gued. That testimony is to the effect that the law is merely penal, and that it gives to the Egyptian Government a right—as yet unasserted—to commence proceedings for the confiscation of the instrument, and in Gued's opinion does not abrogate expressly or impliedly the articles of the Egyptian Commercial Code by which the property in bearer paper is transferred by a simple remittance of the instrument. It must be assumed that in giving this opinion, Gued took into account Articles 135 and 136. Under these circumstances, it would seem that the Court in this proceeding would be required to hold that plaintiff's title under the Egyptian law is no more than voidable. And since the Court has not been referred to any public policy of the State of Minnesota which condemns free trade in negotiable paper between foreigners

in Egypt, plaintiff's violation of a foreign penal statute is not a sufficient defense to plaintiff's right to bring this action.

 Defendant also contends that the initial delivery of the check in question was conditional and that he received no consideration for it. These contentions are not disputed, of course, but they constitute valid defenses only against a holder not in due course. Minn.Stat. 1953, Sections 335.09, 335.14, 335.22, M.S.A. Defendant argues that plaintiff cannot be a holder in due course because he did not take in good faith. He urges that the extreme doctrine of negotiability should be invoked to curtail the ordinary contract defenses only when necessary to protect legitimate trade in negotiable paper, and since plaintiff acquired the check in a so-called black market transaction in violation of Egyptian law, and under such suspicious circumstances that he should have made further inquiry in the exercise of reasonable care to discover the true situation in the negotiation of this check, he is not a holder in good faith. Sec. 335.201, Minn.Stat., provides:

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) that it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was a fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

The Supreme Court of Minnesota, in Pennington County Bank v. First State Bank, 1910, 110 Minn. 263, 125 N.W. 119, 121, 26 L.R.A.,N.S., 849, stated,

" * * * To establish good faith there must not only be an absence of knowledge of any invalidity, but an absence of circumstances which would put an ordinarily prudent man upon inquiry. If there are such circumstances, and he makes no attempt to ascertain the truth, he cannot claim good faith in accepting the instrument."

 There is no substance to plaintiff's contention that "good faith" as used in Sec. 335.201 is merely synonymous with "absence of notice" or that absence of bad faith constitutes good faith. Moreover, to argue that because Sec. 335.211, Minn.Stat., provides that,

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

absence of knowledge of some infirmity in the instrument or of a defect in the title is the essence of good faith, is to ignore the emphasis which the courts have given to the specific requirement of Sec. 335.201(3), Commercial Union Ins. Co. v. Connolly, 1931, 183 Minn. 1, 7, 235 N.W. 634; St. Paul Gaslight Co. v. Village of Sandstone, 1898, 73 Minn. 225, 75 N.W. 1050.

In State of the Netherlands v. Federal Reserve Bank, D.C.S.D.N.Y., 99 F.Supp. 655, 667, affirmed, 2 Cir., 201 F.2d 455, the court enunciated the following lucid analysis of this section of the Negotiable Instruments Law,

" 'Good faith' is used in this section in the legal or commercial sense. Rochester & C. Turnpike Road Co. v. Paviour, 164 N.Y. 281, 58 N.E. 114, 115, 52 L.R.A. 790. In determining the existence or non-existence of good faith, one must look at all the circumstances of the case. In Rochester & C. Turnpike Road Co. v. Paviour, supra, the court set up the following test: 'Even if his (holder's) actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial

sense he acted in bad faith, and the law will withhold from him the protection that it would otherwise extend. * * * One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose.' "

And see Fehr v. Campbell, 1927, 288 Pa. 549, 137 A. 113, 52 A.L.R. 506.

It may be that there is no absolute requirement that a purchaser must acquire negotiable paper in the ordinary course of business, or in the usual course of business, as those terms were used prior to the adoption of the Negotiable Instruments Law, as a condition of good faith. See 8 Am.Jur., Bills and Notes, Section 367. But "good faith", as used in the Negotiable Instruments Law, nevertheless must be determined in light of all the circumstances of the case, including whether the paper was negotiated to the holder in the usual and customary course of business. Here, in August, 1950, we have plaintiff, Husseyni, first engaging in a conversation with two strangers in a hotel in Cairo, Egypt. Husseyni was a citizen of Syria; Pavie presumably was a Frenchman; and Dawson is alleged to be an Englishman. The conversation between these men took place in French. Dawson could not speak French, so Pavie acted as an interpreter. It is apparent that Dawson had very little conversation with Husseyni. The latter said that during the first meeting Dawson sat at the bar of the hotel drinking most of the time. It was Pavie who negotiated and concluded the check transactions with Husseyni. The latter had not seen Dawson's signature and had no information as to whether the alleged endorsements of the payee were genuine or not. Husseyni must have known that these checks had been smuggled into Egypt. It is significant that he did not ask Pavie to endorse the checks. Pavie allegedly told Husseyni that Mr. Rappaport was a wealthy man, but it seems incredible that a reasonably prudent person would accept such a bare statement from a stranger without some substantiation

before he became a party to the cashing of a check in the sum of $10,000, particularly when this check was drawn on an unknown bank in an unknown city some thousands of miles away from Cairo, Egypt. We have, therefore, a covert transaction in direct and knowing violation of the Egyptian Currency Laws and in which Husseyni made no inquiry as to the nature of the dealings between Rappaport and Dawson nor why a check dated October 2nd and drawn on a bank at Minneapolis, Minnesota, should turn up in Egypt a few days later. He made no investigation, nor even any inquiry, as to the significance of the notation "Part payment on 400 half tracks" written on the check. And when the Court attempts to determine Husseyni's good faith, the significant fact cannot be overlooked that his testimony varies with, and is impeached by, that of Moheish in at least two significant instances. As stated, Husseyni claims he paid par for the checks. That testimony is not substantiated by the deposition of Moheish. He indicates that the checks were taken at about thirty per cent discount, and it is quite obvious that the more reasonable and plausible recital of what took place is to be found in Moheish's deposition. Moreover, Husseyni contends he gave a written letter of guaranty to Moheish, which testimony is also denied by Moheish. Although the cashing of a $10,000 check is not in an amount that under usual business transactions would arouse suspicion, it is not made to appear that either Husseyni or Moheish was engaging in the check-cashing business or dealing in foreign exchange. The words of the court in Drew v. Wheelihan, 75 Minn. 68, 72, 77 N.W. 558, 559, are apposite here:

"The illegality of the check being admitted on this appeal, the cause must be disposed of precisely as if the admission had been made at the trial. Therefore the burden of proof was on plaintiff to establish his good faith when taking the instrument. The presumption was against him, and it was incumbent upon him to

overcome it. Bank of Montreal **v.** Richter, 55 Minn. 362, 57 N.W. 61.

" * * *

"A reputable banking house might discount or purchase an invalid check, presented to it by a man of integrity, without being suspected of bad faith; while an individual not engaged in banking, or in any business which would naturally lead him into discounting or purchasing negotiable paper, taking the same check from an irresponsible party, and under peculiar circumstances, might easily be suspected of having directed or impliedly connived at wrong, or, at least, that he was not unwilling to close his eyes and ears when taking the paper, so that he might not ascertain its real character."

There is no explanation as to why Pavie should have sought out Husseyni to cash these checks, an incident which in and of itself should have instigated suspicion. First Nat. Bank of Phillips v. Denfeld, 143 Minn. 281, 283, 173 N.W. 661. The undisputed fact is that Husseyni did absolutely nothing to ascertain the real character of the checks. The initial conversation between Husseyni and Pavie pertained to the war surplus situation in Egypt. And then, without any explanation whatsoever, or any reason advanced as to why the checks could not be paid through regular business channels, Pavie approached Husseyni and asked his assistance in cashing them. Husseyni made no request for information as to the circumstances surrounding the possession by Pavie in Egypt of a $10,000 check payable to George Dawson and drawn upon an unknown foreign bank, and it is persuasive under these circumstances that Husseyni embarked with Moheish upon a speculative flyer in cashing this check at a substantial discount without making the inquiry that a reasonably prudent person would have made under the circumstances. A cable to the Produce State Bank of Minneapolis would have informed Husseyni that payment had been stopped and that a palpable fraud had been perpetrated upon Rappaport. The claimed inquiry made by Husseyni as to Rappaport's responsibility was merely a casual one. Such inquiry from a stranger cannot meet the standards of care required of one who has the burden of proving that he is a bona fide purchaser for value in good faith. Good faith means something more than naivete. To foster and exalt this transaction in negotiable paper as one entered into in good faith, by our standards, at least, would be to ignore utterly any obligation on a purchaser of negotiable paper to exercise reasonable care. The standards of the Far East in dealing with currency transactions and foreign exchange may be far more loose and informal than the business practices of this forum, but in considering plaintiff's right to recover herein as a good-faith holder of this negotiable check, the question of good faith must be ascertained by the standards of conduct which obtain at the place of payment.

Moreover, Husseyni's position as one who apparently derives his title from Moheish does not improve his position as a holder in good faith. It is obvious that these two men were acting together in a joint venture to make a substantial profit in the cashing of this check at a marked discount. It would be a novel doctrine indeed if Husseyni could be considered as a holder in due course after notice of the dishonor merely because his joint adventurer, Moheish, who may not have been informed of all of the suspicious circumstances that came to the attention of Husseyni, became his transferor. No showing is made to appear as to any basis for distinction between the status of these two men as being holders in good faith. Moheish states in his deposition that he knew nothing about Dawson or Rappaport. He contends that he took the check on Husseyni's responsibility, but he did not require the endorsement of Husseyni. So his relation to the transaction is that of one who cashed this check at Husseyni's instance and who had never seen or heard of Daw-

son or Pavie until about an hour before the transaction was closed. He made no inquiry whatsoever about Dawson or about the circumstances under which Dawson procured the check from Rappaport. He did, according to Husseyni's testimony, make inquiry from him as to Rappaport's financial standing, but in Moheish's deposition in answer to Question No. 4, which reads,

"At the time of its negotiation to your firm, did you know anything at all about the check, about Dawson, about Rappaport, or about anything else in connection with the check other than what Husseyni told you and other than what you were able to read on the check itself?"

he stated,

"I knew nothing about Dawson or Rappaport."

Moheish was a merchant residing in Beirut and was engaged in the import and export business without any connection with a banking or check-cashing institution. The circumstances strongly support the view that both Husseyni and Moheish knew that they were engaging in a so-called black market transaction with two men who were comparative strangers to them and under circumstances which should have incited their suspicions and required them in the exercise of ordinary care to make reasonable inquiry regarding the circumstances of the negotiation of this check from Rappaport to Dawson. This they failed to do. The entire showing persuasively impels the finding that plaintiff has not sustained the burden of proof which the statute imposes upon him to establish that he is a holder in good faith within the meaning of Sec. 335.201, Minnesota Statutes.

In view of the premises, it follows that plaintiff is not entitled to recover in this action and judgment should be entered in favor of defendant with costs.

Findings of fact and conclusions of law consistent herewith may be presented upon ten days' notice. An exception is allowed.