# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 3, 2024        Decided June 13, 2025

No. 24-7047

MADY MARIELUISE SCHUBARTH,
APPELLEE

v.

BVVG BODENVERWERTUNGS- UND -VERWALTUNGS GMBH,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-02140)

*Walter E. Diercks* argued the cause for appellant. With him on the briefs was *Jeffrey Harris*.

*Theresa B. Bowman* argued the cause for appellee. With her on the brief was *Mark N. Bravin*.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This case is the latest chapter in Mady Marieluise Schubarth's pursuit of compensation for land allegedly seized from her family in Soviet-occupied Germany in the immediate aftermath of World War II. She sued BVVG Bodenverwertungs-und-Verwaltungs GmbH (BVVG), an agent or instrumentality of Germany which might otherwise be subject to foreign sovereign immunity, under the expropriation exception to the Foreign Sovereign Immunities Act (FSIA). BVVG argues that U.S. courts lack subject matter jurisdiction because, despite the taking of Schubarth's family property constituting part of a broader land-reform policy imposed upon East Germany by the Soviets, it was nevertheless a domestic taking and not therefore subject to the expropriation exception; the district court disagreed and denied BVVG's motion to dismiss. We agree with the district court, affirm its denial of dismissal and remand for further proceedings.

## I. BACKGROUND

The facts of this case are fully set forth in our earlier decision, *Schubarth v. Federal Republic of Germany*, 891 F.3d 392 (D.C. Cir. 2018). Only those facts critical to the domestic takings rule are addressed here.

After the fall of the Nazi regime in 1945, the three western allies (the United States, United Kingdom and France) together with the Soviet Union established the Inter-Allied Control Authority ("ACC") "in lieu of the non-existing central German government." Karl Loewenstein, *Law and the Legislative Process in Occupied Germany*, 57 Yale L. J. 724, 725 (1948); *see also Clark v. Allen*, 331 U.S. 503, 514 (1947) ("The [ACC] has, indeed, assumed control of Germany's foreign affairs and treaty obligations."). The ACC divided Germany into four sectors, each of which was occupied and administered by a

separate Allied power. *See* Charles Fahy, *Legal Problems of German Occupation*, 47 Mich. L. Rev. 11, 15–16 (1948).

Within the Soviet sector, referred to as "East Germany," the Soviet authorities ordered the expropriation of all agricultural real property of a certain size. This policy was carried out by local German provisional governing bodies, acting pursuant to orders of the Soviet military authorities. The seized properties were then redistributed to landless Germans and others.

One of the East German properties expropriated in 1945 under the policy was a large estate owned by Schubarth's parents ("Estate"). In 1963, Schubarth became an American citizen and, in 1973, she inherited her parents' interest—if any remained—in the Estate. Following Germany's 1990 reunification, the unified German government established a trust to oversee the sale of various properties acquired from East Germany, including properties expropriated during the Soviet occupation. *See Schubarth*, 891 F.3d at 395–96. BVVG is the successor to that trust. *Id.*

Since reunification, Schubarth has sought through the German legal system to recover full compensation for the 1945 expropriation of the Estate but the proposed compensation offered to date amounts to only a fraction of what she estimated to be the Estate's market value. *Id.* at 396–97. In 2014, she sued Germany and BVVG in the District of Columbia district court. That court dismissed the action for lack of subject matter jurisdiction under the FSIA. *Id.* at 394. On appeal, we affirmed the district court's dismissal of Germany but reversed and remanded as to BVVG, concluding that the complaint plausibly alleged that BVVG was subject to the FSIA's expropriation exception. *Id.* at 394–95. Given the procedural posture, our decision assumed the truth of Schubarth's allegations and left

the development of the factual record to the district court. *Id.* at 401.

On remand, the district court directed the parties to conduct jurisdictional discovery. After delays caused by the COVID-19 pandemic, the parties agreed to stipulate that, at all relevant times, BVVG is and has been an agent or instrumentality of Germany engaged in commercial activity in the United States. BVVG maintained, however, that legal issues remained but declined to elaborate. Shortly thereafter, BVVG moved to dismiss, this time alleging that the expropriation of the Estate was a "domestic taking" and thus not within the FSIA's expropriation exception. J.A. 284 (citing *Fed. Republic of Germany v. Philipp*, 592 U.S. 169 (2021)). The district court denied the motion to dismiss and BVVG timely appealed.[1]

## II. ANALYSIS

"We review the district court's jurisdictional rulings on questions of law *de novo*, and factual determinations for clear error." *Simon v. Republic of Hungary*, 77 F.4th 1077, 1094 (D.C. Cir. 2023) (citations omitted), *rev'd on other grounds*, 145 S. Ct. 480 (2025)). Here, no facts regarding the expropriation itself are disputed but the legal import of those facts is.[2]

---

[1] Schubarth's amended complaint asserted two jurisdictional bases: the expropriation exception and the waiver exception. J.A. 141–42 (citing 28 U.S.C. § 1605(a)(1), (a)(3)). The district court granted the motion to dismiss as to the waiver exception but that claim is not before us on appeal.

[2] We have held that a defendant asserting foreign sovereign immunity "bears the burden of proving [it] qualif[ies] for it." *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 796 (D.C. Cir. 2021)

FSIA "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" *Philipp*, 592 U.S. at 175–76 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). "The Act creates a baseline presumption of immunity from suit" for foreign sovereigns and their agents unless a specified exception applies. *Id.* One exception is the "expropriation exception," which provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –
>
>  . . . .
>
> (3) in which *rights in property taken in violation of international law are in issue* and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3) (emphasis added). The phrase "rights in property taken in violation of international law" incorporates the "domestic takings rule" and "assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law" and thus not

---

(internal quotations omitted). That standard was recently challenged before the Supreme Court, Brief of the United States as Amicus Curiae Supporting Petitioners at 32, *Republic of Hungary v. Simon*, 145 S. Ct. 480 (2025) (No. 23-867), but the Court declined to reach the issue. *See generally Simon*, 145 S. Ct. 480.

subject to the expropriation exception. *Philipp*, 592 U.S. at 176, 187.

We conclude that the 1945 expropriation of the Estate was not a domestic taking. Whereas a domestic taking does "not interfere with relations among states," a taking "implicate[s] the international legal system" if it "concerns relations among sovereign states." *Philipp*, 592 U.S. at 176–77. Here, the expropriation was not a domestic taking because it necessarily implicated both Germany and the Soviet Union.

The parties agree that at no point during the occupation did Germany, as a sovereign entity, cease to exist. *Cf. Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 137 (1938) ("[T]he rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it."). Therefore, even during the occupation, German citizens retained their German nationality; and they possessed an alien nationality in relation to the occupying power. When the Soviet occupiers performed domestic government functions in East Germany, those functions were, according to the Thuringia State Agency, "carried out on the basis of the sovereignty of [the Soviets as an] occupying power[]." J.A. 217–18. When those functions included taking property owned by German citizens, the takings necessarily "constituted an injury to the [German] state." *Philipp*, 592 U.S. at 176 (citations omitted). It follows that the expropriation of the Estate implicated the separate sovereignties of both Germany and the Soviet Union, necessarily "interfere[d] with relations among states" and therefore could not constitute a domestic taking. *Id.* at 177.

Even if, as BVVG urges, we were to agree with the Second Circuit that the "default" rule is "that a regime's governmental conduct redounds to the sovereign," *Republic of Iraq v. ABB*

*AG*, 768 F.3d 145, 157–58 (2d Cir. 2014), we do not conclude that it extends to a sovereign that is under the control of an occupying power. "[I]t is generally agreed that the occupant does not succeed to sovereignty over the occupied territory, but has only limited administrative authority." *State of the Netherlands v. Fed. Rsrv. Bank*, 201 F.2d 455, 461 (2d Cir. 1953). It follows that the occupier's actions cannot be attributed to the separate sovereignty of the occupied state but instead the sovereignty of the occupied state exists separately during the occupation. *Cf.* F. E. Oppenheimer, *Governments and Authorities in Exile*, 36 Am. J. Int'l L. 568, 569 (1942) ("The local authorities established in the territories under belligerent occupation and exercising administrative activities under the control of the occupying Power do not enjoy sovereignty."). International law holds the occupying power responsible for actions taken in the occupied territory precisely because an occupation assumes a clash between sovereigns. *See, e.g.,* Convention Respecting the Laws & Customs of War on Land (Hague IV), Oct. 18, 1907, 36 Stat. 2277 ("Hague Convention"), Annex Art. 42–56.[3] That the actual seizure of the property was carried out by local German administrators matters not. During an occupation, "[t]he authority of the legitimate power ha[s] in fact passed into the hands of the occupant." Hague Convention, Annex Art. 43. As the controlling authority in East Germany at the time of the expropriation, the Soviet Union could not deny responsibility

---

[3] According to the Hague Convention, "[t]erritory is considered occupied when it is actually placed under the authority of the hostile army." *Id.* at Annex Art. 42. The Hague Convention restricts an occupier from confiscating or pillaging private property, *id.* at Annex Art. 46, 47, and limits the amount and purpose of taxes an occupier can impose, *id.* at Annex Art. 48, 49. Violators are "liable to pay compensation . . . for all acts committed by persons forming part of its armed forces." *Id.* at Art. 3.

for its acts merely by relying on local agents to carry out its orders.

It also matters not that the Soviet Union redistributed the expropriated land largely (or even entirely) to Germans. The Soviet Union was no less implicated in the expropriation merely because it did not retain the property. *Cf.* Restatement (Second) of Foreign Relations Law § 192 (Am. L. Inst. 1965) ("Conduct attributable to a state that is intended to, and does, effectively deprive an alien of substantially all the benefit of his interest in property, constitutes a taking of the property . . . ."). And because the Soviet occupiers directed the taking of the Estate from German citizens, the Soviet Union and Germany were both implicated in the expropriation. *See Philipp*, 592 U.S. at 176–77 ("[A] sovereign's taking of a foreigner's property . . . implicate[s] the international legal system" and, unlike a domestic taking, "interfere[s] with relations among states."). The after-the-fact disposition of the property does not change the nature of the original seizure.

Our decision is a narrow one. BVVG moved to dismiss because, it argued, the expropriation of the Estate was a domestic taking not subject to the FSIA's expropriation exception. The district court held, and we affirm, that the expropriation was not a domestic taking. We need not determine at this stage of the litigation whether the expropriation in fact constituted a taking in violation of international law. We instead leave it for the district court to determine, in the first instance, whether "the relevant factual allegations [] make out a legally valid claim" that the Estate was taken "in violation of international law." *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017).

For the foregoing reasons, we affirm the district court's denial of BVVG's motion to dismiss and remand for proceedings consistent with this opinion.

*So ordered.*